I'm glad you brought Seattle weather. I like it, and so do the roses. Okay, you lose. Plus, from now on, it will be the same for month after month after month. A little rain is nice. Your Honor, there are essentially three issues in this brief, and in many ways they are related to essentially findings that were prejudicial, and I really think it's unusual to kind of argue prejudice backwards, but I think it will show really the nature of the errors and how they were interrelated. The prejudice in this case is that Mr. Lopez-Lopez was found to be an organizer. He was found to be an organizer for a drug conspiracy which exceeded five kilograms of cocaine, and at that time, he was also sentenced for uncharged offense conduct. It was actually charged, but it was separated out. It had been actually sort of severed out, and he had not been tried on it. There was no jury finding on it. There was no evidence that was presented at that trial, and the errors in this case, one, is the expert being allowed to testify, and he was not, I think, qualified to testify as an expert on the area in which he actually had expertise, which was the structure of drug trafficking organizations. The second part was that when Mr. Lopez-Lopez attempted to put on a witness his own brother who had been a co-defendant in this case to counteract the testimony of an informant, or actually not an informant, an accomplice, who now was testifying against him that he was not a supervisor, the government would not offer immunity or indicated that he would not be given immunity, that, in fact, he would be subject to prosecution should he testify, because his original... Was the government asked? No. No. All right. We'll get into that argument. And then the third part is that in the findings, essentially, the expert testimony and then other testimony was being used to somehow make him not only an organizer at sentencing, but also to go beyond and sentence him for other drugs that had not been charged. I want to try and look a little bit, not the facts of the trial, but just sort of the procedural way this case came in to sort of see how we got there. There was a multi-count indictment that was issued against Mr. Lopez-Lopez, which included his brother. That was in case, I'm going to call it case 603. And Mr. Lopez-Lopez was the last man standing in that particular case and went to trial on that. There was another indictment that was filed in case 602. That was the one that was against Mr. Lopez-Fonseca. That was issued separately, I think, because Lopez-Fonseca actually fled the jurisdiction and was ultimately extradited back. Essentially, what happened then is when Lopez-Fonseca came back, the government moved to consolidate the two cases. And Lopez-Fonseca's lawyer objected. The court granted the motion for half-way and said, I will grant that motion, but I will not consolidate them and have Mr. Lopez-Fonseca face the charges that are against Mr. Lopez-Lopez because the meth cases and the heroin cases that are being involved in that case would prejudice Mr. Lopez-Fonseca. The reason I'm bringing that up is because obviously when it came time for sentencing then, lo and behold, it looks as though all of a sudden those charges that came in were then used and were used to sentence Mr. Lopez-Lopez after he went to trial on what was this severed case. Now, the issue essentially involving the expert, I think, is fairly straightforward in looking to see what we argued, what I certainly tried to qualify the expert on here. This is someone who had never testified as an expert in federal court. He had never testified on the basis of drug trafficking organizations. He had only testified in state court once involving drug cases as to whether something was basically a possession for sale or personal use amount. He had testified in gang cases in state court, but in fact indicated that many of the considerations that he used in gang cases were different than the ones that he would testify to as to drug trafficking organizations in federal court. In fact, he actually differentiated that gangs, for example, in state court try and recruit people and that the ones that he was looking at in federal court were exactly the opposite. They wouldn't let people in. They wouldn't let people try and work within the organization. Because of that, he had absolutely no experience on his own from working within this organization. In other words, he hadn't been by being allowed in there to somehow get expertise just by this. He just didn't have it. I've always looked at Dobert and Kumho and those cases and looked at the gatekeeping function that a court has to determine what is an expert. That seems to be fairly rigorous. We'll talk about whether you have areas in which there is expertise and referee journals and peer review. Then there's this other pole in which someone somehow gets to become an expert because they've done that kind of work. That always seems to be done in terms of agents, in terms of either drug trafficking or alien smuggling organizations or whatever. This case, I've tried to look and I see that the court has on various cases tried to look and get what can be the criteria to try and reconcile these two. But this case, I just based either on prior work as an agent, testifying or dealing with the area in which he has any expertise or any aspect he's had in dealing in this particular case would qualify as an expert. Counsel, it seems to me that where this becomes difficult is you objected to his qualification as an expert on, I'll call it drug slang and drug organization. Correct. The court found that he was qualified on the basis of his experience to do that. If he had simply testified as he started off to do, drug gangs or excuse me, drug groups such as this one, conspiracies, have someone who's in charge and then there's a sort of acting chief operating officer and then he breaks these down into levels and I gather there was a chart. Would you objected to that or is what you're objecting to the fact that he then looked at various people in the case and said, and this person's a runner and this person's a lieutenant and this person's a chief operating officer. Which were you objecting to? Well I was objecting to him, okay, I was objecting to him testifying as an expert in general and the actual basis on which my objection was done was on two. One was that he had not, he had been offered an expert on two bases. One on drug trafficking, on organization and the other on use of coded language. The coded language I said was unnecessary and in fact I thought was unnecessary because the person who was the main accomplice testified that this is what we meant on the tapes. The court, the district court said, well wait a minute, you're going to attack that person's credibility, I think this person may be used as an expert to give some sort of added gravitas or imprimatur or some sort of whatever. Turns out he didn't testify as to that. He testified actually only as to the structure of the drug trafficking organization. Well that's not true because he testifies what yellow is, what white is, what ladies are, I mean he's got all kinds of terms that he interprets for the jury. Well I think he may have done some of that but I mean I wasn't particularly objecting. You didn't object at all to any of that. Well, no, because it was ultimately going to come out and did come out when it was explained through the, essentially the accomplice who was the one who said this is what we meant, this is the language we used. What I was objecting to and did intend to object to was any testimony that was going to talk about drug trafficking organizations and then I did not specifically object to saying okay, he can talk generically about drug trafficking organizations but I object to him now testifying as to how this question is placed into it. Okay, so we've now gotten to the same place. There are specific questions that are asked such as is Lopez Lopez a runner? And he says no he's not a runner, he's higher up in management in part because he's a family member. Was there an objection to that? Because when I read the transcript I didn't see an objection to it. No, I didn't object to it because I thought that at the time saying that he is not qualified as a person to testify as drug trafficking organizations would be sufficient to stop him from testifying either for that and I don't think he was qualified to do that and then obviously he'd have to get through that threshold to say whether or not he could testify as an expert on drug trafficking organizations and if he's not qualified to do that then he doesn't get to the second part. I did not object to the second part. My feeling was, I'll tell you exactly what my feeling was at trial, was that once he came in then I was going to try and attempt to use and try and flip what was their expert and try and show that there were things that would not give a basis for his opinion. I'm not going to say that's a strategic decision because I'm not trying to back off from where that question might go. I just thought that the objection when specifically he was not qualified to do that particular area, anything in the scope of either drug trafficking organizations or how it would specifically apply to this  The reason the prejudice is this. It gave, it was giving essentially showing not only was he a higher up in the organization, which I guess is a role issue ultimately, which is not a sentencing issue, is not something for the jury. However, it was prejudicial in this case because it would show that he was beyond just the amounts that he appeared to actually be negotiating or actually delivering. If you read this, I mean at the trial, what this case essentially turned into in the cocaine conspiracy was, and essentially it was my defense that he was guilty of the other conspiracy but not particularly this one. And not because the loop, if you listen to what was happening, all the negotiations that were going on were essentially between Lopez Fonseca, people that were directly involved with Lopez Fonseca, like his wife, where there was Guero 2. I had Guero 1. Things got very confusing. Guero 2 sort of showed up and appeared to be working with Lopez Fonseca. All the negotiations that were going on essentially on the cocaine were going on between them. And my client was only involved that I could see specifically that was being involved with that particular conspiracy at one time when he was told to deliver $5,800 for payment for something that had been done to Castaneda while Castaneda was out of town and he was dropping it off. So the focus that I was trying to get at was obviously that this was very limited, that his involvement in this particular conspiracy was very limited, and therefore he was either essentially a trial, was responsible for a lesser amount of drugs, that they couldn't prove certain amount of drugs, and obviously to try and argue with sentencing that he didn't have a role. The reason why it was prejudicial for the expert to say that he is higher up, that he is more trusted, and that he has this sort of supervisory role, obviously is going to raise him and will, I think, did contribute to the finding by the jury that he was responsible for more drugs than was actually proven that he was involved in this case. So that's the prejudice. Well, would you concede, I just don't want to take all your time, but would you concede that in regards to the cocaine quantities, the testimony involving the supply source in Mexico, they're talking about two kilos, three kilos, and if that's in the conspiracy and the jury's determination was he was in the conspiracy, then you're in trouble on your quantity argument. Well, I'm in trouble on my quantity, well ultimately the jury only made, they were only did not consider anything beyond what was actually the amounts, the actual amount of cocaine that was used in sentencing was actually fairly limited. It was essentially the crack cocaine that was seized at the so-called stash house, and I did not contest that. The reason I did not contest that, I mean, there was obviously contact between him and the people that were there. One of them was his brother. I thought that was going to be a ridiculous argument to say it was not, I mean, really ridiculous, as opposed to morally ridiculous, to be part of that stash house, but at sentencing, the district court actually did not get into the, I mean, there were pounds and keys and huge amounts of supplies that was being brought out, and it certainly seemed that at sentencing, the district court also considered and thought that that particular organization really was, it was much, it really was separated from what Mr. Lopez Lopez was doing, but that's on to argument three. First, we have to go to argument two. I did not ask for a, for immunity, and so let's, I'm going to... Then we review for clear error, right? Well, all right. I think, I mean, rather than spend minutes saying that I think this record is sufficient, I'll say let's do clear error, and I think if we do under plain error, it is still plain error, and the reason it is plain error is this. The, I mean, the facts are, and just real briefly, I had called, I had brought in Mr. Lopez Lopez's brother whose, and we're going to call him Juan, and Juan came in, because his name is Juan Lopez Lopez, and Juan came in and was going to testify, was produced in court. His lawyer, his former lawyer, because he had actually been sentenced, came in and advised him. I said he didn't have a Fifth Amendment privilege because at this point, he had been sentenced, his plea was over, he was not looking at any particular, he was no longer involved in this case, so he really wasn't a co-defendant. His lawyer had advised him that potentially he would be looking at more incriminating, or a possible prosecution, because as part of his deal, he had pled guilty to operating a stash house, but other parts of the conspiracy had been dismissed. So I attempted to put him on, and he took the Fifth Amendment. The government was there and indicated that when asked whether or not he could be charged with further offenses, and I think the, one can look at this and say, was he, if he would be charged with further offenses if he testified, or would he just be charged with further offenses? I'm saying from the context that it was clear that, it certainly was implied that if he testified that the government would consider reviving the charges, and the question was just could they? And the answer was yes, because it was dismissed without prejudice. So at that point he then said, well, I don't want to testify, because he was looking at having the conspiracy charges arrived against him, and as Judge Robart has just said, theoretically into relevant conduct he could be liable for multi-key cocaine conspiracy. At that point I asked the judge to give him judicial immunity. I did not request it from the government, but I did ask, I thought essentially from the context of what was going on, the government was not going to give him immunity, and that he was facing, at this point, a prosecution if he offered to testify. Here's where the error, now whether I had properly made that request or not, ultimately then the issue once, the issue is whether or not. There was now a distortion of the fact finding process because, and the reason why I think it was, and why there is a prejudicial aspect on this, the government was allowed to present testimony of an accomplice, Casaneda, who got up there and said, yes, he's a supervisor. I put on one of the people who supposedly was being supervised, the one who was still in the country. The other one had been deported, was now in Mexico, and later at sentencing I tried to contact him and bring in a declaration from him. But I found someone who was in this country, who was a person who supposedly had been supervised, to say, I wasn't being supervised, he's my brother, he came over here. I was trying to offer contrary testimony to that particular issue. I could not do so because he was facing prosecution under the Fifth Amendment if he testified. I mean, excuse me, not under the Fifth Amendment. He was facing prosecution if he testified, and therefore he took the Fifth Amendment. So the fact finding process that I had laid out, and I think was laid out, certainly would be a prima facie case to show that the fact finding process was now being distorted. Because someone who was testifying for the government, who was getting a potential benefit, and said my client was an organizer, the jury got to hear that. I couldn't put on someone who said, no he's not, because the government would charge him or revive charges against him if he got up there and testified. And that had to be an issue that had to be resolved by the trial court. The trial court, however, did not resolve that issue. It did not actually do what was the focus of what would be a Westerdahl hearing. It said, we don't need to do this because I find he's an organizer. The record is replete that he's an organizer. Well, that's aggravating the error. Because if the courts, the courts to see if the fact finding process is distorted, instead has gone and made a factual finding itself without any contrary evidence. That was an issue for the jury. The fact finding process was the jury to see whether or not, in fact, there was testimony that he was or wasn't an organizer. But to say, I'm not even going to let you get there because I, as a judge, find that he is and there's nothing that's convinced me that he's otherwise, is the error. Well, nonetheless, I mean, you could have said, you know, prudent, you could have said, nonetheless, Judge, I request that you conduct a hearing and, you know, Well, I never, I never, direct the prosecutor to consider I never, well, I mean, I still wanted the hearing. I mean, I still wanted to have a, I wanted to have him have judicial immunity. I wanted him to have some means by which we could put him on. I did not say, Judge, I'd like to have a hearing. But I still was requesting and saying, I didn't ever abandon that request. I want to have this person on because, under Lord and Westerdahl, the fact finding process is getting distorted now because they're able to put on somebody who they, who's getting a benefit from them and I can't put on someone who is looking at a potential threat. And the prejudice is, the government's argued that the prejudice is, well, this is really just an issue of role and that's an issue for sentencing. But I think it also was, again, it would show the extent of his involvement. It could show the extent of how much he was liable for the drugs, what drugs he was liable for. And so I think it is a prejudicial error. It also is, I mean, and so for the jury, I think it was, they should have been allowed to hear that. Now, of course, I got talking, but the most interesting issue, I think, is actually the sentencing issue. But I'll just get over it briefly. Essentially, the effect of this, and there's a six-part test, which is cited both in the government's brief and my brief. I think we meet four of those prongs. The, Mr. Lopez-Lobos was sentenced essentially for methamphetamine that was never, was not charged or found by the jury. The judge actually- Did that violate a prendi? Well, no, it didn't violate a prendi because it, there was a statute of maxima still, even if he got less than 40 years. So it's not an apprendi violation, but this court has found that where you have- Filthy had to be a pretty important fact, right? Well, yeah. It drove the sentence. I mean, it, well, it jumped at six offense levels. I mean, it was, and so that usually it's four or more is one of the issues. And, and when the, when the district court essentially severed the first, the cases, it, it made really a finding, I think, that these two weren't related. It was going to try and protect Mr. Lopez-Fonseca because he didn't want to be prejudiced by this other conspiracy. And then, lo and behold, when it came time for sentencing, it's all part of the same conspiracy. But what do you do with Grissom? Where, where this situation and that, it's even worse. It's conduct that's not even charged. It seems to me so in analogy to your situation. And yet the court has said, ah, fine, go ahead, bring it in. Well, you can bring it in, but then you have to do it under a higher standard. And I ask that it be done under a clear and convincing standard. And ultimately, as the court said, we're going to do it under a preponderance standard. I just don't think, I mean, I, I know that, I know I'm over my time, so I'll try and go fast. But even in this post-Booker and whatever post-university you want to have, that if there is going to be a dramatic increase in the guidelines, and under Gall and Kimbrough, the district court's determination of the guidelines is important. I mean, it is not, it is, it is not advisory. First, you have to see if it's done correctly. And then, the second part, to see if there's anything that goes outside the guidelines. Well, if this would have jumped, even, even without the 188, as opposed to 121 to 151, that's without it. Or, it jumped to 292 to 365. But without that, he's still at a much lower guideline range. And that's even below the adjustment the district court made, trying to, for disparity on, in terms of conduct under the 3553. So, for those reasons, I'd like it to go back to the district court. May it please the Court. Caleb Mason, representing the United States. Assistant United States Attorney from the Southern District of California. Your Honor, the reason that I submitted a supplemental excerpt to the record is because this case, particularly the issue with respect to immunity, is very fact-intensive. And I'd like to direct the Court's attention to page 66 and following of the supplemental excerpts of record, so we can actually take a look at the chronology of that hearing and the interactions among the three parties. I would first direct the Court's attention to the case of Patterson that I mentioned in my brief, at page 22 of my brief. The quotation there, if it can be shown, this is what this Court said, if it can be shown that the prosecution intentionally distorted the fact-finding process by causing a witness to invoke the Fifth Amendment privilege, then the due process concerns kick in and acquittal is required, unless the hearing is shown or the witness is granted immunity. In this case, there was no causation. And I think the chronology demonstrates that irrefutably, if we start at page 66, Mr. Leckman, the attorney for the witness, comes in and says, it's Benjamin Lopez's request to call Juan Miguel Lopez. I've met with him. He's indicated his desire not to testify. He's going to plead the Fifth Amendment. He will invoke his Fifth Amendment privilege. This is the top of page 67 of my supplemental excerpts of record. For the next two pages, defense counsel argues that there's no Fifth Amendment privilege because there's no threat of prosecution here. If we turn to the metaphor that he uses in his blue brief, at this point, he did not see any instruments of torture. What he saw was a person who was so far from being threatened by prosecution that he didn't even have a privilege to invoke. Well, on page 68, again, the Fifth Amendment privilege is reiterated. The argument continues. It's not until page 69 that the government even enters the conversation. Finally, on page 70, the court asks the government attorney, in the government's view, would it be able to prosecute Mr. Lopez Lopez for running a stash house during other periods during the course of this investigation? The specific words of that question are very important. The court did not ask, would the government prosecute this defendant or this witness if he testified, did not ask whether the likelihood of prosecution was in any way tied to the testimony. It asked whether there was a legal ability, based on the fact that his prior plea and sentencing concerned events of one day, whether or not he would be potentially subject to criminal liability without any double jeopardy concerns for acts that took place in other periods of time. The government attorney answered, yes, I believe that we would have a legal ability to bring charges for the operation of the stash house outside that time period. She then emphasized that she had had no contact with either of the two parties about this issue and she had not participated in any discussions. President Defendant's Counsel. Let's stop for a second. At this point, the Juan Lopez Lopez lawyer is in the courtroom and he's advising his client concerning the potential of the government bringing additional charges. And the U.S. attorney says, I believe we have a legal ability to bring charges regarding the stash house or to bring charges in substantive accounts that may relate to drug transactions during that time period. He hears that. He then goes back and advises his client, if you testify, you are going to be potentially exposed to additional charges. Your Honor, no, he had already advised his client of that. In fact, that's why I started this excerpt of record on page 66. Mr. Lechman came in and told the court that he had already spoken to his client and his client had already made the decision to invoke the Fifth Amendment. So that invocation and Juan Lopez Lopez's decision to invoke came before there had been any response from the government to this question, before that question had even been asked. So the causation that is required by this court's case simply cannot be present on this Furthermore, there was in this case no proffer about what this witness would have said. In the cases that I cited in my brief, specifically Westerdahl, Young, and Lord, there are two types of proffer that the defense typically makes and made in those cases. One is a proffer as to specifically what this witness would say. This witness will say the following. He will say that my client is innocent. He will say that my client is not there. There is no such proffer here. In this record, what we see is a proffer from counsel as to what the questions would be. And in fact, he says I'm going to limit my questions very sharply. I am not going to ask. And in fact, let me just, let me just, this is page 68 of the government supplemental excerpts of record, starting at the bottom. I can give a proffer as to what the questions are going to be. The proffer of the questions are going to be would he be able to identify the area that was the stash house? Was he there? Did he see his brother? And that's it. I do not intend to ask whether he was an organizer, whether my client was a supervisor, if he saw anybody else in the conspiracy. He's purely a percipient witness describing when he was at this particular location and if he saw my client there. If so, what was he doing? I would return to the first sentence of that paragraph. I do not intend to ask whether he was an organizer. That was the proffer that was made. And that was the proffer that was made to the district judge as to what this testimony would be. There was also no proffer as to whether or not there had been government misconduct. This district judge was not presented with an allegation that there had been any misconduct such as a threat or such as communication. In the cases that I cited, specifically a case like Young, the witness testified that the prosecutor had said to him, if you testify, I will charge you. In Lord, we had a similar allegation. In the case that I cited in the footnote in my brief, there was a testimony from the witness that the prosecutor had said to him, if you testify, I will charge you with a capital crime. All of those cases involved a proffer from the defense that the government had made specific communications to the witness about what the consequences would be of testimony and that those consequences would be adverse. In this case, we have no such allegation, not at trial, not in the pleadings. From no one do we have any suggestion that there was any such communication. And for that reason, the United States would like to see this area of law clarified in a published precedential opinion that we can cite and that can give guidance to future litigants in this area because this happens all the time, that there are multiple witnesses out there, any one of which might be desired by one party or defense in a criminal context to be immunized and to be witnesses. And the United States and the courts need to have some guidance as to when exactly they will cross the line into Westerdahl-Lord misconduct. We would submit that in this case there was absolutely no misconduct and there was no error, that both the government attorney and the district court behaved exactly as they should given the facts before them. The district court responded to a situation in which he was given no proffer, in which there was no request for immunity, no allegation of misconduct. Accordingly, he did not hold a Westerdahl-Lord hearing. He did not grant immunity. I think that that issue is fairly straightforward. The complicating problem is that the case law does not, I think, sufficiently specify what the boundaries are for a government attorney responding to a question from the court about theoretical criminal liability. We do not have in a published case that I can cite and quote to this court those facts and this court's legal interpretation of whether those facts can give rise to misconduct on a chronology such as this where the invocation comes before any comments made by the government attorney. If there are further questions on this, I'd be happy to address them. Otherwise, I can turn to the other two areas. No, that's fine. Thank you. With respect to the qualification of the expert, I cited in my brief a number of cases in which this court has very straightforwardly recognized qualification as an expert in drug trafficking activity based on undercover activities. I would make one factual correction with respect to the reply brief. The agent in this case, Agent Billy Gomez, testified and the testimony before the court indicated in his qualification hearing that he had participated in hundreds of investigations. The number 10 is the number of investigations in which he was the lead undercover agent. His participation in undercover investigations was not limited to those in which he was the lead undercover agent. He had participated in other ways, for example, in monitoring wiretaps, in hundreds of investigations and that is what he testified to. He testified to his fluency in Spanish. He testified to his interactions with both the drug dealers that he worked with when he was undercover and also with informants that he dealt with. He testified to the ways in which he updated and maintained his fluency in the vernacular of drug trafficking organizations. He established his qualifications, I think, quite adequately under this case. He was testifying essentially as an expert, precipient witness. In this case, Your Honor, there might have been, had it been raised either below or on appeal, that lingering question that Judge Robart alluded to about the dual role of an expert and the lay witness and Freeman obviously foregrounds this issue for us. But I would respectfully submit that this case is not the place to get into that because it was not raised below and it was not raised in the briefs. We haven't briefed it. We haven't argued it. I would certainly concede that that is a theoretical problem that the government needs to be very careful of in future cases. However, on this record, we just haven't gotten into it. It's not part of this appeal. With respect to the third issue, the sentencing issue, the Valencia factors are, I think, somewhat notoriously so, like the Taylor categorical approach, a little bit difficult to understand some of them, how they apply. I would certainly concede on two of the issues. As I indicated in my red brief, I think there are a couple others that could perhaps go either way. However, the government met its burden even if the heightened clear and convincing evidence standard is what is required. In this case, the evidence for the meth transaction came in the form of a statement from Agent Jacob Galvian, who was an eyewitness to those events. This again is in the supplemental excerpts of record, the entirety of his statement. He listened to phone calls involving the defendant, Benjamin Lopez Lopez, requesting that Benjamin Lopez Lopez go to a certain place, meet a certain person, bring a certain package, a certain quantity of methamphetamine. Benjamin Lopez Lopez was then observed by Jacob Galvian to come out of his house, walk to a car, put this package in the car. That car was then followed to its destination. It was observed visually by the agents until it got into the hands of the two defendants who were ultimately arrested with it. Agent Galvian had testified at the suppression hearing in the prior proceedings before the other counts were severed to the same district judge, to these same facts. This was evidence that the district judge had already heard. He knew it came from an eyewitness. It surely meets a clear and convincing standard. I think it would meet it beyond a reasonable doubt standard. Where was the evidence on the meth? The evidence of the meth is the evidence I'm just describing. The precipient witness, Agent Galvian, who watched Benjamin Lopez Lopez, carried the package to a car. The car was then followed to its destination. It was transferred to another party. That party was then arrested with that meth in its possession. The jury never heard about the meth, right? The jury did not hear about the meth, no. The standard here, I mean, if Booker had come out differently, this would be a different case. But in the post-Booker-Gaul world, the issue for us is simply what standard of proof here? Is it preponderance of the evidence or is it clear and convincing? The United States argues that the clear and convincing standard is meth, even if the Valencia factors are thought to go the defense's way in this case. Okay. If the Court has no further questions, I will conclude there. Thank you. I've run out of time, but can I ask a few things? Well, we ask. You can tell, but in any event, you can have a minute. Well, on the... Wait. I'm sorry. Now you can start. If I may. Go ahead. I think the reason I'm inquiring on the Court's question is concerning the qualification of the expert. If you're drawing a distinction between one is, is he qualified to talk about general expertise and drug trafficking in general, I did object on that. I think the other issue is whether or not there should have been a separate objection saying that he's not an expert, but he can testify as a percipient lay witness. So there should have been a second... I'm trying to learn from this if it ever happens again. Is, in fact, that there should have been a second objection that he wasn't qualified to actually be a percipient lay witness on this? You know, Counsel, I don't know if I can tell you how to try your case, but it seems to me the objection would have been lack of foundation. You know, how does this witness know these things that he's testifying to, specifically in regards to your client? Okay. Well, I mean, again, I'm going to... I think the general objection saying that he's not been qualified specifically as an expert would be, would be sufficient on that, but obviously the Court decides it. On the issue of the sentencing, my objection was not specifically that he was not involved in methamphetamine trafficking, and I did not attack the basis that he was involved in that. What I was saying was that it was not part of the same scheme or plan. It was not part of the same relevant conduct, and I have to say it is surprising that the government now is referring to a transcript on a hearing and a suppression hearing that isn't part of this record, but I'm not going to specifically object to that, but I do think it was, given what the District Court did in severing these two cases and saying that they did not want to have the conspiracy of one go and prejudice a co-defendant, that is a finding that raises the issue of whether or not this was sufficient relevant conduct, and that, and it's being sentenced for methamphetamine activity in this conspiracy that is the error. Thank you. Yes, I did understand that being your objection. Okay. Thank you, Counsel. The last case for the day. We'll come up next. This case is submitted.
judges: Fisher, Paez, Robart